## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 27 2017, 9:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of J.D., Minor Child, and J.H., Mother,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

October 27, 2017

Court of Appeals Case No.
49A02-1705-JC-980

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Rosanne Ang, Magistrate

Trial Court Cause No.
49D09-1605-JC-1675

**Brown, Judge.**

[1] J.H. ("Mother") appeals that trial court's order determining that J.D. is a child in need of services ("CHINS"). Mother raises four issues which we consolidate and restate as whether the evidence is sufficient to support the court's determination that J.D. is a CHINS. We affirm.

## Facts and Procedural History

[2] In September 2015, Family Case Manager Kyla Thomas ("FCM Thomas") began working with Mother regarding an ongoing CHINS matter involving four of Mother's children. On April 28, 2016, Mother gave birth to J.D. On May 4, 2016, DCS assessment worker Tiarra Wright received an assessment related to allegations that Mother had an open DCS case at the time and had given birth to J.D. prematurely who remained in the hospital.

[3] On May 18, 2016, the Department of Child Services ("DCS") filed a verified petition alleging J.D. to be a CHINS. Specifically, DCS alleged that: Mother and Father had failed to provide J.D. with a safe, stable, and appropriate living environment free from domestic violence; Mother and Father had a history of domestic violence and were involved with DCS through an open CHINS action regarding their other children; services had not successfully been completed to remedy the reasons for DCS's involvement and the other children had not been returned to their care; and Mother and Father were recently involved in a physical altercation and had not taken necessary action to adequately address the issues.

[4] In August 2016, Natalie Hicks, a family case manager supervisor, conducted a team meeting and efforts were made to transition the older children into Mother's home, but Mother was incarcerated for a short period of time which "kind of slowed it down."[1] Transcript at 46.

[5] On November 2 and December 19, 2016, and January 12, 2017, the court held fact-finding hearings. DCS presented the testimony of FCM Thomas, domestic violence counselor Amanda Wilson, visitation facilitator Dinah Jordan, Father's mother, and Family Case Manager Shané Penney ("FCM Penney"). After DCS rested, Mother and her mother testified. Mother testified that she completed domestic violence services in the CHINS case involving her other children, that Father hid in Mother's closet at one point when the visitation facilitator arrived because he was scared, and that Father never hurt the children. When asked how she felt about Father, Mother answered: "He just can never see my kids again." *Id.* at 181.

[6] FCM Penney testified as a rebuttal witness that she heard Mother say that she had completed domestic violence treatment, but she had not completed treatment. FCM Penney testified that she spoke with Mother on January 4th

---

[1] When asked about her brief incarceration following [J.D.'s] birth, Mother answered:

> When I gave birth to him I didn't know that I had a court date of – so it was failure to appear. When I went I turned myself in and they couldn't get me in Court. I sat in there three weeks because my – I went to Court three times, but my lawyer wasn't showing up to Court so the Judge wouldn't release me until she showed up.

Transcript Volume II at 183.

and told her that DCS had not received documentation to prove that she had completed domestic violence treatment and that she would be contacting the head of their therapy department, which was the agency Aspiring Transformations. She also testified that she heard Mother testify that she will and has called the police every time that she sees Father, but Mother had told her that she does not contact the police at every incident that occurs with Father because she does not want it to make her case worse.

[7] On March 22, 2017, the court found J.D. to be a CHINS. Specifically, the court found:

> 3. [Mother] and [Father] have a history of domestic violence which has negatively impacted their older children. In September of 2015, [Mother] and [Father's] older children became subjects of Petition Alleging Children to be in Need of Services ("CHINS") due to these incidents of domestic violence.
>
> 4. The following has occurred under the older CHINS matter: On December 10, 2015, [Mother] admitted that the older children were in need of services and entered an admission which read, in part, that "[Mother] is a victim of domestic violence perpetrated by [Father] for which she needs assistance." On January 14, 2016, the Court conducted a fact-finding regarding [Father]. At that time, the Court found that additional incidents of domestic violence had occurred between [Father] and [Mother] after the filing of the CHINS petition. On February 11, 2016, [Father] was ordered to engage in Father Engagement, substance abuse evaluation, random drug screens and domestic violence services.
>
> 5. [Mother] has not completed the ordered domestic violence treatment.

6. [Mother's] older children have not yet been returned to her care.

7. [Father] has been violent with [Mother], has stolen property valued at nearly $8000 from [Mother] and has a violent history with other women.

8. [Mother] continues to minimize the significance and risk the continued domestic violence poses to herself and the children. [Mother] has indicated that she was forced by the service providers to obtain a no-contact order against [Father] and stated that she intended to have this dropped. Additionally, [Mother] informed the DCS Family Case Manager in December of 2016 that she will allow [Father] to come to her home "anytime she wants".

9. [Mother] has continued to have contact with [Father] despite this history of violence. [Father] resided with [Mother] at the time [J.D.] was born. This continued contact has led to additional incidents of violence which [Mother] continues to minimize. As of the final day of testimony of the fact-finding, [Father's] mother believed [Father's] address to be the same as [Mother's].

10. [Mother] has violated the safety plans designed by the DCS to ensure her older children's safety in her care. Despite being aware that [Father] was not engaged in domestic violence treatment or any other ordered treatment, [Mother] allowed [Father] to be in her home during an unsupervised parenting time session with the older children which occurred on September 7, 2016. On this date, [Mother] attempted to conceal [Father's] presence in her home from the service provider assigned to conduct an unannounced visit to check on the safety and well-being of the children.

11. [Mother] has been recommended for parenting education as she is often overwhelmed while exercising parenting time with all

of her children. [Mother] has also failed to fully feed [J.D.] during this parenting time session.

12. [Mother] has been recommended to engage in anger management courses as she has been verbally aggressive toward the DCS and service providers and has threatened physical harm to the caregivers of her children.

13. Service providers have smelled marijuana while visiting [Mother's] home and [Mother] has admitted to allowing the use of marijuana in her home.

14. [Mother] has engaged in criminal activity during unsupervised parenting time with [J.D.]. [Mother] has admitted to stealing items while [J.D.] was present and using his baby bag to conceal the stolen items.

15. [J.D.'s] physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the children's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision. [Mother] has remained in a situation of violence with [Father], allows drug use in her home and has engaged in criminal activity during unsupervised parenting time with [J.D.]. [J.D.] is not safe in [Mother's] care until these issues are addressed.

16. [J.D.] needs care, treatment, or rehabilitation that he is not receiving and unlikely to be provided or accepted without the coercive intervention of the court. Despite already being ordered to do so in her older children's CHINS matter, [Mother] has failed to engage in the therapeutic services which can assist her in extricating herself from a violent relationship. [Mother] has continued to have contact with [Father] and minimizes the danger of continued violence. The intervention of this Court is necessary not only to compel [Mother's] participating in much needed treatment, but to ensure that [J.D.] receives appropriate

care until this treatment allows [Mother] to effect the necessary change for . . . her and the child's safety.

Appellant's Appendix Volume II at 112-113.

[8] On April 13, 2017, the court held a dispositional hearing. That same day, the court entered a dispositional order.

## *Discussion*

[9] The issue is whether sufficient evidence supports the trial court's determination of J.D.'s status as a CHINS. In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* at 1287. As to issues covered by findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* We review remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[10] Ind. Code § 31-34-1-1 provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the

child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[11] The CHINS statute, however, does not require that a court wait until a tragedy occurs to intervene. *In re A.H.,* 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect the child. *Id.* Ind. Code § 31-34-19-6 provides in part that the court shall enter a dispositional decree that is "in the least restrictive (most family like) and most appropriate setting available" and "is least disruptive of family life."

[12] Mother argues that the court's finding that she minimized the serious nature of domestic violence by allowing Father into her home ignores the fact that Father had been authorized by the court to have contact with his children and DCS was permitting him to live at her home while he was doing services. She also asserts that when Father punched the television set, Jordan, the visitation facilitator, had brought Father to Mother's home so he could obtain his keys. Mother points out that the court entered an order allowing Father to have contact with his children in December 2015 and DCS did not request that the order be changed until March 27, 2017. Mother also argues that, even if she

had taken the domestic issues lightly before, by the time of the fact-finding hearing, this was no longer the case. She contends that there was no evidence that coercion by the court was necessary to protect J.D., and, without citation to the record, that caseworkers testified that she had completed all services except for one remaining class. She also argues that the court's dispositional order violated the statutory mandate to enter a disposition that is the least restrictive and least disruptive of family life.[2]

[13] DCS argues that the unchallenged findings fully support the trial court's finding of CHINS. It asserts that the trial court correctly found Mother continued to have contact with Father and minimized the risks this contact caused her and J.D. DCS contends that Mother allowed Father to reside with her before he received any treatment and that Father's ability to exercise parenting time does not support a belief that DCS condoned Father living with Mother while he continued to refuse to participate in services to address their relationship.

[14] Mother acknowledges that Father has a criminal history of intimidation, carrying a weapon without a license, and domestic battery. She also does not specifically challenge the court's findings that Father has a violent history with

---

[2] Mother also contends that Father was not notified that the CHINS had been filed until after the CHINS finding and dispositional order were entered and that, although Father did not object to the procedure used by the court, it was a fundamental violation of due process. In response, DCS argues that Mother did not object to the trial court, that Mother waived any objection, that she even objected to the presentation of evidence about Father as irrelevant, and that Mother lacks standing to raise this issue. Mother waived any error in proceeding to fact-finding and disposition by not objecting at trial. Moreover, we cannot say that Mother has shown that she has standing to appeal the order on behalf of Father. As such, Mother's argument as it relates to Father is unpersuasive.

other women, that service providers smelled marijuana while visiting Mother's home, that she admitted to allowing the use of marijuana in her home, and that she engaged in criminal activity during unsupervised parenting time.

[15] With respect to the domestic violence, at the November 2, 2016 hearing, FCM Thomas testified that she had not seen a change in Mother's outlook regarding domestic violence. She also testified that, at the end of her time at DCS, Mother "still minimized the domestic violence." Transcript Volume II at 32. FCM Thomas testified:

> The concern is again the continuation of – the continuous minimization of the domestic violence. [Mother] has, had been very transparent with me in saying, "I just want my case closed", and so that to me – back and forth – her and [Father's] relationship. They were on sometimes, off other times. Without [Mother] receiving or I guess I should say participating and being completely honest in therapy I don't believe that the reason for DCS' involvement have been rectified in terms of domestic violence and that cycle and then the thinking pattern that goes along with.

*Id.* at 39-40. Wilson, the domestic violence counselor, testified that Mother was in her sixteen-week group counseling from December 2015 through March 2016, but she did not complete the program and that she was discharged under special circumstances because of complications with her pregnancy, and that at the time of Mother's discharge the recommendation was to complete the program.

[16]  Jordan, the visitation facilitator and home-based caseworker, testified that on May 11, 2016, she dropped Father off at home which was where Mother lived, she waited for Father to return outside to retrieve a key to move a van, she called after about five minutes, and Mother exited the residence without any shoes and came up to Jordan's vehicle. According to Jordan, Mother stated that Father hit or broke her TV, they were fighting, and Father punched the TV. Jordan also testified that Father was in Mother's home on September 7, 2016, while some of the children were present and when there was a protective order in place and that the presence of Mother and Father in the location of children was a concern for her because of the case involved domestic violence.

[17]  At the December 19, 2016 hearing, Father's mother testified that she witnessed "[d]omestic, arguing, etcetera" between Father and Mother, that Father's face was slashed a little over a year ago, and that Mother confessed to her that she and Father were in a dispute. *Id.* at 115. FCM Penney testified that she had discussions with Mother about keeping Father away from the children and that Mother stated, most recently on December 2, 2016, that she would have him in the home whenever she felt like it and that no one could tell her who she can have in her house because she is grown. FCM Penney testified that Mother "gets easily angry," that she spoke with Mother about a recommendation of anger management, and that Mother stated that she was not participating in any more DCS recommended services until her children were returned. *Id.* at 142. FCM Penney also testified that she and Mother had a discussion about Father hiding in Mother's closet and that Mother had stated: "Duh, of course

he would hide, hide in the closet. I wouldn't want anybody to catch him." *Id.* at 139-140.

[18] At the January 12, 2017 hearing, FCM Penney testified that she heard Mother say that she had completed domestic violence treatment, but that she had not completed treatment. She also testified that she heard Mother testify that she will and has called the police every time that she sees Father, but that Mother had told her that she does not contact the police at every incident that occurs with Father because she does not want it to make her case worse. The guardian ad litem stated: "I'm afraid for the kids' well-being if they get into some [domestic violence] incident and those kids are there then we have some serious issues." *Id.* at 211.

[19] Given the unchallenged findings, and the evidence and testimony presented at the fact-finding hearing, we cannot say that the trial court's findings of fact, conclusions, and judgment related to the domestic violence between Mother and Father and Mother's minimization of such violence were clearly erroneous. The evidence supported the conclusion that J.D. is a CHINS. *See Roark v. Roark*, 551 N.E.2d 865, 869-872 (Ind. Ct. App. 1990) (holding that the evidence presented at a fact-finding hearing was sufficient to support the CHINS finding); *Parker v. Monroe Cnty. Dep't of Pub. Welfare*, 533 N.E.2d 177, 179 (Ind. Ct. App. 1989) (observing that the court does not have to wait until a tragedy occurs in order to take action and holding that the evidence supported the conclusion that the children were CHINS).

To the extent Mother argues that the dispositional order violated the statutory mandate to enter a disposition that is the least restrictive and least disruptive of family life, we observe that the dispositional order granted authorization to place J.D. in relative care and granted authorization for unsupervised parenting time for Mother conditioned upon Mother abiding by the safety plan and DCS ensuring that unannounced visits by DCS occur. We cannot say that reversal is warranted on this basis.

## Conclusion

For the foregoing reasons, we affirm the trial court's conclusion that J.D. is a CHINS.

Affirmed.

Najam, J., and Kirsch, J., concur.